## No. 16,497.

### WYMAN *v.* JONES.
(228 P. [2d] 158)

Decided January 22, 1951.    Rehearing denied February 26, 1951.

Messrs. MOYNIHAN-HUGHES-SHERMAN, for plaintiff in error.

Messrs. DELANEY & STEWART, for defendant in error.

*En Banc.*

Mr. Justice Holland delivered the opinion of the court.

The parties hereto own adjoining acreage in Rio Blanco county. Plaintiff in error will be referred to as plaintiff. His land is west of defendant's land, and the White River crosses defendant's land in a westerly direction and turns north and continues along the north boundary of plaintiff's land. Plaintiff is the owner of the Hayes Ditch with headgate, since 1931, located on the westerly bank of the river and on defendant's land. Near this headgate is the mouth of the former channel of the river, which extended in a southerly direction, thence westerly across defendant's land, and over and across the plaintiff's land. Long prior to the commencement of this action a dam had been constructed across the mouth of this channel which held the river within its present channel and kept it out of the old "slough" or channel. This dam was maintained by plaintiff and his predecessors.

Prior to 1947, at a place considerably distant to the east of the headgate and mouth of the old channel, the river meandered across the lands of defendant following a curve of approximately a half circle, and at times of high water, in May and June of each year, encountered the southerly bank of this curve causing great erosion, which resulted in damage to, and loss of, defendant's meadow lands below. In the spring of 1947, defendant sought to eliminate the curve and prevent further erosion by constructing an artificial channel between the points of extremities of the curve and by the aid of dams and embankments, thereby causing the river to flow through the artificial cut and eliminated the flow of the river from the bend. This artificial channel originally was about twenty feet wide and three feet deep. There is a distance of about one thousand feet down stream from the point where the artificial channel rejoins the

original channel of the stream to plaintiff's ditch headgate.

This diversion of the course of the river caused it to overflow on defendant's land and thereupon to overflow the lands of the plaintiff, destroying crops and causing other injury to plaintiff, and started to form a new channel through the meadow of plaintiff's land. The diversion caused a portion of the water to run back into the old stream bed and destroy the dam or rip-rapping which protected plaintiff's irrigation ditch headgate.

In January of 1948, plaintiff filed his complaint for injunctive relief seeking to have defendant confine the river to its old and natural course and enjoined from causing the river to depart from the old channel, from which plaintiff alleged he would suffer great and irreparable injury; further alleged that defendant was not financially able to respond in damages for the threatened injury; and that he already had been damaged in the amount of $3,000.

Defendant answered, admitting that he had changed the course of the river through his land and that the damage to plaintiff's land was caused by unusually high water and the negligence of plaintiff in not properly maintaining his dam and his failure to release a wing placed in the river to facilitate the operations of his headgate. Defendant further alleged that due to the unusually high water in 1947, plaintiff's land would have been overflown had the channel not been changed; that the breaking of the dam was caused by the lodging of a tree which deflected and backed up the river water; and further, as an affirmative defense, alleged that the damage to plaintiff's land could be prevented by repairing the dam; and that the granting of the requested equitable relief would result in irreparable damage to the defendant.

The matter was tried to the court without a jury, beginning April 21, 1949. The trial judge made two trips of inspection to the property involved during the course

of the trial which was completed on May 10, 1949. The record contains approximately 1800 folios, and we believe the errors assigned can be better considered by setting out in full the findings of the trial court, which are as follows:

"1. The parties are the respective owners of adjoining parcels of land described in the pleadings, that of the plaintiff lying to the west of that of the defendant, all in Rio Blanco County, Colorado, and the White River flowing in a general westerly direction intersects and crosses the lands of both parties. Said stream is of large volume and force during the spring months of each year when the run-off from the melting snow at the source of the stream, so augments the normal flow that the waters overflow the banks and inundate the adjacent low bottom lands at various points and places along the stream.

"2. Prior to 1947 the White River as it meandered over and across the lands of the defendant, followed a curve or bend approximately a half circle, shown on Defendant's Exhibit '1', and the aerial photographs in evidence, and in the course of its natural flow particularly at periods of high water during May and June of each year engaged and encountered the southerly bank of said bend at its southerly extremity, as a result of which the southerly bank eroded and sloughed, and this was a continuing process resulting in damage to and loss of the defendant's meadow lands.

"3. To straighten the channel, eliminate the said curve, or bend and to prevent further erosion and damage, the defendant in the spring of 1947 caused an artificial channel to be cut between the points or extremities of said curve and by dams and embankments caused the river to flow through said artificial cut and diverted and eliminated the flow thereof in whole or in part, from the bend.

"4. The plaintiff is the owner or claimant of the James Hayes' Ditch, the headgate of which is and has

been since about 1931 in the southerly or westerly bank of White River at a point approximately one thousand feet westerly from the westerly junction of the artificial channel referred to, and the previous channel. The headgate and a part of the ditch are located on defendant's lands.

"5. Prior to the construction of the artificial channel as shown by the exhibits, including the aerial photographs, and other evidence produced, the course and current of the stream as it proceeded from the westerly extremity of the bend, tended in a direction slightly north of westerly, whereas following the completion of said channel and the diversion of the waters therein, the river and its current at said point flowed and tended in a southwesterly direction, as a result of which for a distance of approximately 400 feet, the thread and current of the stream was deflected southerly, which has caused and is causing erosion and attrition of the southerly bank of said stream throughout said distance and said process has been continuous during the high water periods of 1947, 1948 and 1949.

"6. The defendant in order to avoid and prevent said deflection of the current and to retard and control the erosion along and upon the southerly bank of the stream at the point under consideration, has partially constructed and plans to complete an embankment or revetment reaching from the southerly bank of White River at or near the westerly confluence of the old and the artificial channels, extending westerly about 200 feet through the present channel of the stream and midway roughly, between the present banks, and consisting of logs, trees, brush, sand, gravel and earthen material, with the logs anchored and snubbed by substantial cables to large trees on the bank of the stream near said confluence.

"7. As a result of such last mentioned structure the tendency, course and current of the river has been controlled and deflected toward the northerly bank in large

part, and the erosion and deterioration of the southerly bank along said 400 feet retarded and it is the plan and intention of the defendant to ultimately complete said structure so that further erosion and damage to the southerly bank will be prevented.

"8. The permanence, stability and efficiency of said structure is a matter of some uncertainty, but a decision and finding in this respect is not essential to a present decision of the instant case.

"9. The headgate of the plaintiff's James Hayes' Ditch is located on defendant's land, at or near the apex of a bend in the river and so situated and placed that the thread of the stream and the main force of the current tends directly into and upon it, which present condition the court believes and finds has existed since the headgate was located at its present situs about 1931, where it has since been used and maintained.

"10. At or near said headgate and on the southerly bank of the river, is the mouth of a former channel of the White River, which channel extends from the mouth or inlet in a southerly direction and thence westerly to the west boundary of defendant's and the east boundary of the plaintiff's lands, and from thence over and across the lands of the plaintiff. The said former channel is also referred to in the evidence as the old channel, the slough and the Wyman slough.

"11. Prior to 1947 there was constructed and, without protest or objection from defendant, plaintiff has maintained, a dike or dam across the mouth of said former channel to contain the water in the present channel and prevent its emergence into the former channel. The Court concludes from the evidence that said dike or embankment had been maintained by the plaintiff and in a measure, served its purpose from year to year for a long period prior to 1947, but during many of said previous years as shown by the evidence and with the river at flood state, water escaped over, through, or around said dam and into said former channel and that

during the year 1947 and during said previous years when water so escaped, the lands now owned by the plaintiff, previously owned by others, were inundated and flooded and farming and ranching operations thereon and the care of stock were hindered and retarded and damages and injury suffered, as in the complaint set forth.

"12. The Court finds the plaintiff has suffered damage to his headgate by reason of the force and impact of the current or stream thereon consisting principally in the erosion and disintegration of the embankments on either side of the gate.

"13. From examinations of the lands and of the White River, and from the evidence received during the trial, it appears and the Court finds that for a distance of approximately 500 feet easterly from the plaintiff's said headgate the banks of the White River are unimpaired, (except for the destruction of the dike or dam in 1947), and that the erosion and attrition referred to in paragraph 5 above, is entirely absent; the banks, particularly the southerly bank are intact and the thread of the stream and the main force of the current follow a line approximately midway between the two banks, and the stream and its character and propensities, along said distance, to the time and date of this hearing were and are unaffected by the construction and use of the artificial channel by the defendant and the consequent change in the channel and flow of the stream to the west thereof.

"14. Although the construction of the channel by defendant and diversion of the river there through, occasioned an increase in the velocity and momentum of the stream and its current, it was apparent from the evidence, aided by visual inspection, that such increase spent itself within 400 to 500 feet of the stream westerly from the confluence, beyond which point the velocity and momentum were unchanged.

"15. That to the time and date of the Hearing and trial

the damage and injury caused and occasioned by said change in the channel were and are to and upon the defendant's lands; and the defendant only, has suffered damage and injury as a result thereof.

"16. During the spring of 1947 the dike or dam across the mouth of the former channel washed out and was in large part destroyed, and it has not been rebuilt nor repaired, as a result of which the water from the stream during the high water periods of 1947, 1948, and 1949, escaped the present channel into the former channel and to the lands of the plaintiff. But the evidence and the examinations do not show, and the Court is unable to find that the loss and destruction of said dike and consequent damage to the plaintiff resulted directly, proximately, or otherwise from the change in the channel so made by the defendant and which is the basis of the plaintiff's complaint. On the contrary the court finds that the channel change made by defendant was not the proximate cause of plaintiff's damage and injury.

"17. The evidence discloses other reasons and causes for the destruction of the dike and the release of the flood waters; including the disposition and lodgment of a large tree in the stream near the headgate during the spring of 1947, in front of and northerly from the said dam, abnormally high water in the run-off in the spring of 1947, and insufficient and inadequate repair and maintenance of the dam, and these considerations and phases of the evidence tend to support the court's finding that the change in the channel made by defendant was not the cause of the damage complained of in the complaint.

"18. To the south of said thousand feet of stream running between the said confluence and the plaintiff's headgate, is an area of low meadow land belonging to defendant and varying in width from a few feet at the easterly end to several hundred yards at the westerly end, which low land extends to and borders upon the easterly bank of the old channel or slough. During 1947

at the time of the highest water, the White River overflowed its southerly bank and covered said low land in whole or in part and flooded into said former channel and in a measure not necessary to determine, occasioned or contributed to the damage complained of by plaintiff from flooding and inundation. The Court finds that said overflow of said low lands has occurred in previous years and at similar times and is and has been an usual occurrence in the spring of the year, at all events in years of unusual high water and large runoff, and that the change in the channel so made by the defendant and the southerly deflection of the current, did not cause or augment said overflow to any appreciable or measurable extent and that the overflow complained of would have occurred in approximately the same measure and amount and with the same result, had not the change in the channel been made.

"19. The Court observes and is of the belief that should the present erosion of the southerly bank as above found be permitted to continue, that ultimately the channel of the stream will be so changed that the headgate and the dike will be by-passed and the river channel will follow the southerly boundary of the low land mentioned, and reach the former channel or slough. But a present finding in this respect would be no more than speculation, and is unnecessary to the present decision, but it is the intention that these findings and the judgment, cover and contemplate conditions as they now appear and have occurred and developed to the time of this hearing, and do not contemplate nor cover future developments or contingencies, now not appearing.

"20. Plaintiff has not proven by a preponderance of the evidence, the essential allegations of his complaint."

We will not undertake to review the mass of testimony contained in the record, but will content ourselves by making pertinent observations therefrom. The case here rests squarely on the question of whether or not plain-

tiff's showing, and some of defendant's admissions, entitled plaintiff to the injunctive relief prayed for.

An injunction is primarily a preventive remedy and protective in its character. It may issue to prevent further wrong, although no right has yet been violated. The true virtue of injunction is in the anticipation and prevention of injuries if probable and threatened.

Our study of the record discloses that after this action was instituted, defendant tacitly acknowledged that as a result of the diversion channel which he had placed in the river, great damage and erosion to the south bank of the river was caused when he undertook to construct a revetment in the river to control and prevent further erosion of the south bank. Overflow at this point eventually would carry into the old channel of the river below and cut a new channel across plaintiff's land.

The underlying purpose of plaintiff's action was to prevent formation of a new river channel through his premises. It is not specifically denied that plaintiff's property was exposed to great damage. The evidence shows that the diversion channel constructed by defendant at an original width of twenty feet was at the time of the trial about one hundred fifty feet wide, and that a large mass of sand and debris thereby moved was deposited in the river below, causing the bed of the river to be raised.

That defendant had the right, when staying within the boundaries of his property, to do such things as were thought to be necessary for the protection of his property, cannot be denied. However, in the enjoyment of this right, he could not adopt a method that would damage or create a new injury to others, especially the plaintiff herein.

We now turn to the findings of the court hereinbefore set out in full, which we believe are inconsistent with the judgment entered thereon. In paragraph 5 of the findings, the court found that, following the completion of the channel and the diversion of the water therein, the

current of the river flowed and tended in a southwesterly direction, which has caused, and is causing, erosion and attrition of the southerly bank of said stream for a distance of about 400 feet. At paragraph 19 of its finding, the court stated that if the present erosion of the south bank of the river as it had found, be permitted to continue, the channel of the stream would be so changed that plaintiff's headgate and dike will be by-passed; and that the channel will follow the southerly boundary of the low land mentioned and reach the former channel. (It is shown by the evidence that this would cut a new channel through plaintiff's land.)

In paragraph 10 of the findings, the court stated that the "slough" or old channel extends over and across the land of plaintiff.

In paragraph 6 of the findings, the court said that defendant, "to avoid and prevent said deflection of the current and to retard and control the erosion * * * at the point under consideration, has partially constructed and plans to complete an embankment or revetment * * *."

The court further found in paragraph 7, that it was the plan and intention of defendant to ultimately complete the structure so that further erosion and damage to the southerly bank would be prevented, and further in paragraph 8, the court stated, *"The permanence, stability and efficiency of said structure is a matter of some uncertainty, but a decision and finding in this respect is not essential to a present decision of the instant case."*

We do not believe that the trial court, in the face of its findings, could rightfully deny injunctive relief to plaintiff, thereby compelling him to stand by and suffer injury and damage while defendant might, or might not, complete a dam or revetment that would eventually prove to be insufficient. It is clear from the court's findings that injunctive relief was denied because defendant had voluntarily attempted to protect the south bank of the river from erosion. It also is clear from the evidence, and can be determined from the court's finding, that in

the event the dam or revetment partially attempted to be constructed by defendant fails, then the direct result of defendant's original change in the diversion of the stream, if allowed to remain, would be irreparable injury to plaintiff as outlined in his petition, shown by the evidence, and reflected in the findings. It is our opinion that the trial court on its findings should have granted plaintiff's petition. We believe the ruling of this court in the case of *Crisman v. Heiderer,* 5 Colo. 589, is controlling here.

There are other interesting points specified for reversal, but which we do not think it necessary to determine.

That objective justice between the parties hereto may obtain, we must note the fact that fifteen months elapsed after the filing of the complaint herein before trial, and the further fact that nearly two years have intervened since the date of the decree of the trial court. It is undisputed that after the filing of the complaint and prior to trial, defendant was in the process of constructing a revetment to obviate the imminence of further damage to plaintiff's property. The trial court, while finding that the permanence, stability and efficiency of this structure was a matter of some uncertainty, determined that a ruling in that respect was not essential to a decision of the case. To permit defendant the enjoyment of the right to use his property as may be desired, without injury to that of others, and especially that of plaintiff, this cause should be, and is, remanded with instructions to the trial court to determine upon hearing whether or not the revetment has now been or is to be immediately completed, and to determine the permanence, stability and efficiency thereof, as well as that of other work defendant may have done since the trial of this cause; and also determine the damages, if any, plaintiff had sustained prior to the construction of any such preventive measures. If, upon such hearing, the trial court, from competent evidence, determines that the measures attempted

by defendant to prevent damage to plaintiff's property are not efficient, and will not be efficient, then the injunctive relief sought by plaintiff should be granted. The judgment is reversed and the cause remanded with instructions for further proceedings as herein indicated.

MR. CHIEF JUSTICE JACKSON, MR. JUSTICE STONE and MR. JUSTICE HAYS dissent.